**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KASHMAN HARRIS | : | |
| 15 Deer Path Road | : | |
| Robesonia, PA 19551 | : | CIVIL ACTION |
| | : | |
|     Plaintiff, | : | No. 21-1636 |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| SEMS, INC. t/a | : | |
| Skippack Emergency Medical Services, Inc. | : | |
| 4058 Mensch Road | : | |
| Skippack, PA 19474 | : | |
| | : | |
|     Defendant. | : | |
| | : | |

**SECOND AMENDED CIVIL ACTION COMPLAINT**

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1. This action has been initiated by Kashman Harris (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against SEMS, Inc. t/a Skippack Emergency Medical Services, Inc. (*hereinafter* referred to as "Defendant," unless indicated otherwise) for violations of Section 1981 of the Civil Rights Act of 1866 ("Section 1981" - 42 U.S.C. § 1981), Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000e, *et seq.*) and the Pennsylvania Human Relations Act ("PHRA" - 43 P.S. §§ 951 *et. seq.*). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

**JURISDICTION AND VENUE**

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. Any state claims herein or included would be proper under

this Court's ancillary or supplemental jurisdiction to hear state claims arising out of the same common nucleus of operative facts as those set forth in Plaintiff's federal claims.

3. This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this District because actions underlying this case occurred in this District and Defendant is deemed to reside where they are subject to personal jurisdiction, rendering Defendants herein as well.

## **PARTIES**

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is an adult male residing at the above-captioned address.

7. Defendant is a Pennsylvania entity providing Ambulance services regionally in Southeastern Pennsylvania.

8. At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## **FACTUAL BACKGROUND**

9. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

10. Plaintiff is a 56-year-old, black (African-American) male.

11. Plaintiff was hired by Defendant in or about August of 2004; and in total, Plaintiff was employed with Defendant for approximately 16 years (until January of 2020, as explained *infra*).

12. Plaintiff's supervisory hierarchy (in ascending order) while in the employ of Defendant (at relevant times surrounding his termination) was as follows: Todd Evans (Direct Supervisor); Dan Greco (Chief of Operations); and Barry Evans (President).

13. Plaintiff worked for his first few years with Defendant as a Paramedic. By 2006, Plaintiff was promoted to the position of Battalion Chief.

14. As the Battalion Chief, Plaintiff worked in a management role, supervised employees, ordered supplies, and engaged in hiring or other management duties as typical of his role.

15. As Battalion Chief, Plaintiff was generally scheduled for 36 hours per week wherein he was still working the majority of hours as a Paramedic but getting paid and working approximately 12 of the 36 hours in a supervisory or administrative capacity. Hence, Plaintiff worked approximately 24 hours as a Paramedic simultaneously.

16. In or about 2016, the workplace dynamic was changing dramatically. In particular, a second "Evans" family member was brought into management. At this point in time, Jeanne Evans (wife of Barry Evans) had also become a supervisor working with (and above) Plaintiff.[1]

17. In the timeframe of 2016-2017, Plaintiff had started experiencing quite a hostile work environment (outlined below). Notably, prior to 2018, Plaintiff had performed remarkably, had never been counseled or disciplined, and was viewed as an outstanding Battalion Chief for nearly a decade.

---

[1] Barry Evans was the President, and Jeanne Evans was brought in as the Chief of Skippack EMS.

18. Todd Evans, Dan Greco, and Jeanne Evans were quite hostile with Plaintiff such that Plaintiff formed the opinion it was likely racially motivated. Plaintiff was in fact the only African-American employee in a supervisory role for Defendant, and Defendant's entire organization was (and likely remains) nearly all non-black.

19. From 2016 through 2018, Plaintiff experienced the following types of mistreatment:

(a) Jeannie Evans was making derogatory comments about Plaintiff within the workplace to many members of Defendant (although she exhibited serious performance problems and narcotics control problems);

(b) Plaintiff was having duties gradually removed from him (such as the ordering of supplies);

(c) Plaintiff was being treated really abusively by Todd Evans, Jeannie Evans, and Dan Greco;

(d) Plaintiff's scheduling decisions were being adjusted or overridden inappropriately;

(e) Plaintiff was being accused of errors that were so inaccurate, Defendant's management was having to apologize to him;[2]

(f) Communication of supervisory matters were not primarily going through Plaintiff, but rather, being directed through other management;[3]

(g) By May 25, 2018, John Kelly (Vice President of EMS) was e-mailing Barry Evans that Greco appears to be intentionally trying to "antagonize" Plaintiff, fails to assist Plaintiff, schedules people without telling Plaintiff, and permits other employees who are totally deficient to continue working without consequence or discipline; and

---

[2] Dan Greco for example e-mailed Plaintiff on February 28, 2018 "to apologize" for his treatment of Plaintiff and stated "I hope that we can move forward from this and work together and if I'm doing something wrong, please tell me so I can fix it."

[3] *See* May 19, 2018 e-mail from John Kelly identifying that Plaintiff's supervisory status as being a direct conduit for communications is being completely usurped.

4

       (h) By June of 2018, John Kelly (Vice President of EMS) was expressing concerns on Plaintiff's behalf that Plaintiff was being singled out and "nailed" for things not enforced against anyone else.[4]

20.     In or about June of 2018, Plaintiff was involuntarily removed from the position of Battalion Chief. This demotion communication to Plaintiff was from Barry Evans.

21.     By July 2018, John Kelly (Vice President of EMS) e-mailed Barry Evans and Dan Greco outlining that: (a) they "accomplished [their] goal of getting rid of Plaintiff; (b) hiring was being done without any input from Plaintiff; (c) Plaintiff was held accountable without any information on supposedly new or changed policies; (d) Greco was "purposely bypassing [Plaintiff] and causing conflict;" (e) nobody else with significant errors or problems were being held accountable except Plaintiff even if Plaintiff did make any mistakes; and (f) what was done to Plaintiff created a very negative image internally.[5]

22.     Following Plaintiff's removal as a Battalion Chief, he was reduced from $34.00 per hour to $29.00 per hour. Additionally, he lost his 12 hours of work in this capacity and was to generally only work the remaining 24 hours in a Paramedic capacity.

23.     Todd Evans (Caucasian) became the Battalion Chief (and remains in this role through the present). As of elevation to this role, Evans was far less qualified than Plaintiff and had exhibited serious performance concerns.[6]

---

[4] On behalf of Plaintiff, Kelly wrote to Barry Evans outlining *inter alia*: Dan Greco: (1) "is making no attempt to work together" with Plaintiff; (2) is creating an unprofessional image by having all scheduling run through him instead of Plaintiff; (3) has created many of the problems that reflect on Plaintiff; (4) condones selective enforcement of clothing policies against Plaintiff and tries to "nail" Plaintiff only.
[5] The types of mistreatment Plaintiff experienced in this complaint were just that, examples. Plaintiff endured much more significant mistreatment, but he provides for notice purposes only several examples.
[6] While Todd Evans shares the same last name as Barry and Jeanne Evans, he is not related to them.

24. Plaintiff continued to work for Defendant from 2018 through 2019. He did so in a very professional, hard-working, and objectively stellar manner. Plaintiff was (and remains) an excellent Paramedic and dedicated to helping people, notwithstanding abuse he endured.

25. During the second half of 2019, Plaintiff was experiencing significant selective treatment. Plaintiff was literally the most qualified Paramedic working for Defendant, yet when he would request or identify availability for work shifts such shifts were repeatedly being given to others, new employees, or per diem workers (who were non-black).

26. Defendant's management also intentionally gave Plaintiff a difficult time claiming Plaintiff no-showed for a shift on December 13, 2019. But Plaintiff had never no-showed for a shift in over 15 years, and him supposedly being scheduled for said shift was not even properly or effectively communicated to him (if it were the case).[7]

27. Nonetheless, Plaintiff was *continually being scheduled through early January 2020*, but Plaintiff was rightfully frustrated that he was not being given so many available shifts on such a disparate and intentionally selective basis. Nor was Plaintiff being given open or available roles of more (or full-time) hours that exited in the second half of 2019.

28. On January 2, 2020, Plaintiff could not internalize what he was feeling any longer. He e-mailed Peter Macaluso (Vice President) and John Kelly (a volunteer EMT at this time) stating he wanted a formal complaint process to be initiated due to "racial hatred against him." He further identified that he had become aware that Greco uses racial slurs.

---

[7] There was only a discussion about Plaintiff possibly working a shift on 12/13/19. Greco (and Todd Evans) had told Plaintiff to put a "hold on that" date for work since there may be a conflict with Plaintiff having another full-time job. Plaintiff expected to hear back about whether he was in fact being scheduled or confirmed to work, as Greco intended to see if another person would cover the shift before considering Plaintiff. Plaintiff did not receive a call, text or e-mail indicating he was actually scheduled to work (if that were indeed the case). Plaintiff was still accused of not working that shift.

29. Instead of scheduling a meeting with Plaintiff based upon his request to discuss racial discrimination concerns:

- On January 3, 2020, Macaluso told Plaintiff "the racial slur is a serious accusation" via e-mail;

- On January 7, 2020, Plaintiff was e-mailed by Greco that his complaints will be discussed at the personnel meeting tonight (inclusive of with Macaluso);

- On January 23, 2020, Plaintiff was e-mailed by Greco: "You have been temporarily removed from the schedule. This includes all shifts from this date forward."

30. Plaintiff was terminated from his employment effective January 23, 2020, as he was <u>never</u> permitted to resume working, never rescheduled, and never given any response to inquiries about when he could resume working. And Plaintiff's termination (regardless of label) occurred ***within 15 business days*** of Plaintiff expressing racial discrimination concerns.

31. <u>Nothing prior</u> to Plaintiff's federally-protected complaint of discrimination resulted in Plaintiff's termination from employment, as: (1) he was still being scheduled up to his complaint of discrimination and thereafter; (2) he only had 1 disciplinary incident to his knowledge in nearly 16 years (although the scheduling issue was not even his fault); and (3) there were no intervening incidents resulting in Plaintiff's (permanent) schedule removal and termination other than his complaint(s) of racial discrimination.

32. Lastly, Defendants did not even meet with Plaintiff about his serious racial concerns, let alone conduct any formal investigation before rushing to promptly retaliate against Plaintiff by and through a permanent schedule removal (and termination from employment).

**Count I**
**Violations of 42 U.S.C. § 1981**
**(Racial Discrimination & Retaliation)**

33. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

34. Plaintiff was demoted, denied additional shifts, denied full-time work, and terminated because of his race.

35. Plaintiff was also denied shifts, permanently removed from the work schedule, and terminated due to complaints of racial discrimination.

36. These actions as aforesaid constitute violations of 42 U.S.C. § 1981.[8] And no administrative exhaustion of such claims is required under § 1981.

## Count II
## Violations of Title VII of the Civil Rights Act of 1964
### (Racial Discrimination & Retaliation)

37. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

38. Administrative exhaustion is required to proceed under Title VII of the Civil Rights Act of 1964 ("Title VII"). Plaintiff legally and effectively exhausted such filing requirements with the Equal Employment Opportunity Commission ("EEOC") as follows:

> (1) On or about January 24, 2020, Plaintiff attempted to initiate and file a Charge with the EEOC for discrimination and retaliation as outlined in this lawsuit, which was to be cross-filed with the Pennsylvania Human Relations Commission ("PHRC"). Once this is done, any deadlines or statute of limitations for EEOC/PHRC filings are automatically tolled because the EEOC is so backlogged while it issues an "inquiry number." Plaintiff was in fact assigned an EEOC inquiry number of 530-2020-02026.
>
> (2) The EEOC upon receiving an inquiry is supposed to meet with a claimant (such as Plaintiff) to formalize a Charge. Due to the COVID-19 pandemic, Plaintiff was not scheduled until 9/9/20 to participate in an EEOC interview to formalize his Charge.

---

[8] *See Jones v. R.R. Donnelley & Sons Co*., 541 U.S. 369, 382, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004)(resolving split nationwide that § 1981 claims are governed by a 4-year statute of limitations. *See also Haynes v. Northrop Grumman Shipbuilding, Inc*., 2011 U.S. Dist. LEXIS 33230, at *14 (S.D. Miss. 2011)(following the Supreme Court's holding in Donnelley, all demotion or termination claims under §1981 are governed by a 4-year statute of limitations).

(3) On 9/3/20, Plaintiff was informed by the EEOC due to "unforeseen circumstances" his meeting to formalize his Charge was "cancelled" and that he would be contacted to "finalize" his "Charge." Therein, the EEOC "apologized" to Plaintiff.

(4) Plaintiff continued to try to follow up with the EEOC to formalize his Charge but had learned that the EEOC lost, misplaced, or closed his file. Plaintiff was regularly expressing concerns to the EEOC that he was unable to check the status of his case on the EEOC electronic portal.

(5) After waiting for more than a year following repeated EEOC errors, Plaintiff was sent an e-mail (dated March 10, 2021) from Robert McMeekin of the EEOC (a Supervisor). Therein, on behalf of the EEOC, McMeekin apologized to Plaintiff stating the EEOC completely failed to follow up with him, the EEOC engaged in a substantial "oversight," the EEOC reopened his inquiry, and wanted information substantiating his Charge.

(6) Plaintiff immediately submitted Charge information and questionnaires to the EEOC on March 16, 2021, *within less than a week*.

(7) Following submissions by Plaintiff to the EEOC as requested, McMeekin again reiterated his apologies, advised that he needed to consult with his management on how to handle the EEOCs errors, and informed Plaintiff that a right-to-sue letter was being issued because so much time had passed.

(8) On March 23, 2021, the EEOC issued Plaintiff a right-to-sue letter for him to pursue racial and retaliation claims against Defendant. And Plaintiff timely initiated this lawsuit from receipt of the right-to-sue letter.

(9) There is nothing Plaintiff could have done further to properly exhaust his administrative claims before the EEOC due to the pandemic and it's repeated errors.

(10) It's well established that there is a frequent problem with EEOC errors and they should never inure to the detriment or prejudice a litigant. *See e.g. Holender v. Mut. Indus. N., Inc.*, 527 F.3d 352, 357 (3d Cir. 2008)(explaining mistakes by the EEOC cannot prejudice any party, and it is for Congress to address institutional problems within the EEOC also recognized by the Supreme Court in *Holowecki*).

39.     Plaintiff's claims herein though are different than as set forth under §1981. Plaintiff only seeks relief under Title VII for those incidents occurring within 300 days prior to January 24, 2020.

40. In 2019, Plaintiff was denied shifts, permanently removed from the work schedule, and terminated due to his race or complaints of racial discrimination.

41. These actions as aforesaid constitute violations of Title VII.

### Count III
### Violations of the Pennsylvania Human Relations Act ("PHRA")
(Racial Discrimination and Retaliation)

42. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

43. Plaintiff re-asserts and re-alleges each and every allegation of Counts I and II of this Complaint, *supra*, as they constitute identical violations of the PHRA.

44. On January 24, 2020, Plaintiff attempted to initiate and file a Charge with the EEOC for discrimination and retaliation as outlined in this lawsuit, which was to be cross-filed with the PHRC.

45. It has been one year since Plaintiff attempted to file his Complaint with the PHRC allowing him to proceed with this action, pursuant to Section 12(c) of the PHRA, 43 P.S. § 962(c).

46. These actions as aforesaid constitute violations of the PHRA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their

willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

  C. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

  D. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

  E. Plaintiff is to receive a trial by jury as requested in the caption of this Complaint.

           Respectfully submitted,

           **KARPF, KARPF & CERUTTI, P.C.**

           */s/ Adam C. Lease*
           Adam C. Lease, Esquire
           3331 Street Road
           Two Greenwood Square, Suite 128
           Bensalem, PA 19020
           (215) 639-0801
           *Attorneys for Plaintiff*

Dated: August 26, 2021